UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ALEXANDER TRAYLOR,

      Plaintiff,

     v.                                    08-3183

DR. BROWN et al.,

      Defendants.

### Case Management Order and Summary Judgment

The plaintiff, currently incarcerated in Western Illinois Correctional Center, suffers from difficulty moving his bowels and intense abdominal pain. He alleges that the defendants have been deliberately indifferent to his plight. While the court does not doubt the plaintiff's medical problems and pain therefrom, the record shows that Dr. Brown, the treating physician at the plaintiff's prison, was not deliberately indifferent to the plaintiff's plight. Dr. Brown referred the plaintiff to outside specialists and followed those specialists' recommendations for diagnostic testing and treatment. The only reasonable inference allowed by the record is that Dr. Brown tried to help the plaintiff, who suffers from hard-to-diagnose and hard-to-treat abdominal pain. That is not deliberate indifference. Accordingly, summary judgment is granted for Dr. Brown. Since there is no underlying constitutional violation, summary judgment is mandated for the rest of the defendants as well.

Before the Court are the defendants' respective summary judgment motions, which are granted for the reasons below.

### Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out

1

specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

### Facts

The events here occurred from December 2005 through March 2008, during which time Defendant Dr. Lowell Brown worked at Western Illinois Correctional Center, where the plaintiff was and is incarcerated. Dr. Brown stopped working at Western on July 25, 2008. (d/e 151, p. 16, ¶ 1).

Before the plaintiff's incarceration he had surgeries in which he asserts that parts of his stomach, intestine or colon were removed, but the details are sketchy. (d/e 155-2, p. 9; d/e 155-2, p. 36; d/e 142-1, p. 15). He also had surgeries during his incarceration in Stateville, but it is hard to pin those down, too. (d/e 155-2, p. 15; d/e 142-1, p. 15; d/e 151, p. 1, ¶ 4). The plaintiff asserts that he was transferred from Stateville to Western Illinois Correctional Center in 2003. (d/e 155-2, p. 12). According to the plaintiff, he was still recovering from a surgery when he came to Western. (d/e 155-2, p. 1). He was prescribed a therapeutic diet of six small meals a day for four months. (d/e 155-2, p. 26). However, that special diet was apparently discontinued for the stated reason that the plaintiff was failing to adhere to it. (d/e 155-2, pp. 26-33). It does not appear that Dr. Brown was involved with this, however.

On December 7, 2005, the plaintiff was admitted to Illini Community Hospital for complaints of chest pain and abdominal discomfort. (d/e 08-3183). The admission report, authored by Dr. Eller, noted a "very large abdominal hernia ... tender to the touch." (d/e 155-2, p. 37). After the plaintiff returned to Western from the hospital, he filed a grievance seeking repair of his hernia and complaining that his bowels had not moved from December 5, 2005 to December 20, 2005, (d/e 12-1, pp. 1-2). He also wrote an emergency grievance to the IDOC Director about his need for hernia surgery and his painful problem with moving his bowels. (d/e 12-1, p. 7-).

On January 29, 2006, Dr. Brown saw the plaintiff for gastrointestinal trouble and dysphagia.[1] Noting the plaintiff's hernia and gastrointestinal problems, Dr. Brown referred the plaintiff to Dr. Hermes, a gastrointestinal specialist. (d/e 142, p. 2, undisputed fact 3).[2] Dr. Hermes saw the plaintiff on February 17, 2006. Dr. Hermes' report states that the plaintiff's

---

[1]According to *Dorland's Illustrated Medical Dictionary (29th Ed.)*, dysphagia is difficulty in swallowing.

[2]When the court cites to an "undisputed" fact, it means that the plaintiff agrees that the proposed fact is undisputed.

primary complaints at that time were trouble swallowing, weight loss, a protrusion through his rectum, and difficulty moving his bowels. (d/e 142-1, p. 6). Dr. Hermes recommended an upper endoscopy and a colonoscopy. (d/e 142-1, p. 6; d/e 142, p. 2, undisputed fact 5).

Dr. Brown followed these recommendations, and the plaintiff had upper and lower endoscopies on March 22, 2006. (d/e 142, p. 3, undisputed fact 6; d/e 142-1, p. 7). Dr. Hermes discovered

> considerable internal hemorrhoids likely accounting for the prolapse sensation that he experiences with bowel movements. He also has Billroth II anatomy in his upper digestive system. There is some gastritis, which I think may benefit from Carafate 1 gram q.i.d. before meals and at bedtime since his serum gastrin level was low and it is unlikely the inflammation is due to acid secretion. He also had a subtle distal esophageal diverticulum, which may account for intermittent symptoms of dysphagia that he described.

(d/e 142-1, p. 7; d/e 142-1, p. 11). Dr. Hermes recommended "[c]ontinued use of stool softeners and fiber supplementation as needed and topical therapy to the hemorrhoids for inflammatory changes. Will follow up with gastric biopsies once available." (d/e 142-1, p. 12 ).

The plaintiff problems did not abate. In April, 2006, Dr. Brown referred the plaintiff to Dr. Petty, a surgeon, for evaluation of the plaintiff's hernia. (d/e 142-1, p. 13). In addition to the hernia, the plaintiff complained of pain after eating and abdominal bloating. (d/e 142-1, p. 16). Dr. Petty diagnosed the plaintiff with a "reducible incisional hernia." (d/e 142-1, p. 14). Dr. Petty described an "obvious midline hernia just above the umbilicus, which measures 6 x 6 cm." (d/e 142-1, p. 15). Dr. Petty noted that he was

> not convinced that this explains all of his abdominal pain problems. I think it is certainly reasonable to repair and see what kind of impact that has on his symptoms. However, I cautioned him that this may not relieve his postprandial pain and bloating. He may have post-gastrectomy syndrome, gastroparesis, etc. If he continues to have problems following hernia repair he will need further gastrointestinal evaluation such a nuclear gastric emptying scan, small bowel follow-through, etc.

(d/e 142-1, p. 16). Dr. Brown approved the hernia surgery, which was scheduled for late June, 2006.

Around May 20, 2006, the plaintiff complained of severe abdominal pain, stating it was an emergency and could not wait for his surgery scheduled in June. (d/e 155-2, p. 63). Dr. Brown prescribed Dulcolax suppositories (d/e 155-2, p. 64). The plaintiff returned to the medical unit on May 24, 2006, to report that the medicine was not working and that he had not moved his bowels in three days. (d/e 155-2, p. 65). Dr. Brown saw the plaintiff on May 25, 2006 and wrote that the plaintiff's problem was rectal prolapse. (D/e 155-2, p. 67). More

Dulcolax suppositories were ordered. The plaintiff complained again of the inability to move his bowels on June 10, 2006. The plaintiff wrote Dr. Brown a letter on June 9, 2006, stating that "[t]here is something very wrong with my body, whenever a certain amount of food get into my body, it seems like it be pushing up against something, which pains very bad, . . . ." (d/e 12-1, p. 17). Dr. Brown saw the plaintiff on June 12, 2006 and noted "consider hernia repair . . . He may yet require rectal surgery." (d/e 155-2, p. 69.)

On or about June 20, 2006, the plaintiff fashioned a home-made enema using the Dulcolax that had been prescribed for him. (d/e 160, p. 2, ¶ 6). This had worked for him before, and it worked that day too, but then the pain returned. He was writhing on the floor in so much pain that a "code 3" was called and the plaintiff was taken to the health care unit. (d/e 155-1, p. 29; d/e 155-2, pp. 70-71). The next day the pain was unabated he was transported to the hospital emergency room. Dr. Zwick saw him at the hospital and noted that "[h]e has had a ventral hernia that Dr. Petty had been following him for. He did not recommend operative intervention for this." (d/e 142-1, p. 25). Dr. Zwick further noted the plaintiff's complaints of severe abdominal pain and that the plaintiff's hernia was easily reducible. (d/e 142-1, p. 26). Dr. Zwick's impression was:

> I will follow this patient along. I see no need for urgent operative intervention. Will recheck x-ray in the morning. If that still shows problems, one might consider CT scan. If we cannot find a reason for the patient's abdominal pain, as far as obstruction is concerned, once might consider GI consultation . . . .

(d/e 142-1, p. 26). The plaintiff, though, had already had a GI consult with Dr. Hermes and upper and lower endoscopies.

A note by Dr. Petty indicates that Dr. Brown asked him to evaluate the plaintiff on June 21, 2006, which was the day after the plaintiff was taken to the hospital. Dr. Petty's notes states, "As I have told him in the past—I don't think hernia repair will cure his chronic pain and constipation, but I'm willing to do it. Can proceed surgery next week as prev. planned . . . ." (d/e 142-1, p. 20). However, the plaintiff does not dispute that when he told the doctors at the hospital of his home-made enema, the doctors decided to cancel his hernia surgery. (d/e 160, p. 2, ¶ 6). Dr. Petty's notes for June 22, 2006 indicate that "surgery scheduled for 6/26/06 canceled per Dr. Petty and Dr. Brown at Illinois Corrections procedure canceled at Blessing . . . ." (d/e 142-1, p. 16; d/e 12-1, p. 16; d/e 142-1, p. 28). The hospital discharge summary stated:

> This is a 57-year-old male who came in with complaints of severe abdominal pain, . . . . He did not have any nausea or vomiting. He had a bowel movement yesterday. Complaining of a sharp cramping pain in the left upper quadrant. At admission, the patient state his abdominal pain has improved although is present in the left lower quadrant as well. Patient was seen and examined by Dr. Zwick in the emergency room who determined him not to be a surgical candidate. Abdominal series done then showed moderately dilated bowel, findings consistent

with probable partial mechanical obstruction or an adynamic ileus.³ Follow up studies today show to be most compatible with an ileus or an early partial obstruction. . . . After speaking to the correctional facility, the doctor who provides care for the patient there, he was advised that patient is not a surgical candidate, they do have the facilities to observe and treat the patient there.

Will discharge the patient today on his medications from home which include . . .[listing meds]. Patient also requires a colonoscopy as an outpatient.

(d/e 142-1, pp. 28-29).

While the plaintiff was at the hospital, and at the instruction of Defendant Fuqua (health care administrator), Nurse Moore wrote the plaintiff a disciplinary ticket accusing him of a dangerous disturbance, drugs and drug paraphernalia, giving false information to an employee, and failing to submit to medical testing. (d/e 156, p. 1, ¶¶ 4-5). The ticket accused the plaintiff of moaning and groaning to such an extent that it upset other inmates and caused a spectacle, refusing to answer questions, and refusing to tell them about the enema or allow himself to be examined.

When the plaintiff was returned to the prison, he was observed in the health care unit for 23 hours. (d/e 151, p. 17). After that he was taken to segregation pursuant to the disciplinary report. He asserts that it was very hot in the cell, with no ventilation. He asked a nurse for a suppository to help with his constipation, but she refused, citing Dr. Brown's orders that no laxatives would be offered at this time. (d/e 160, p. 2, ¶ 8; d/e 155-2, p. 4). On June 30, 2006, the plaintiff was found guilty of misusing prescription medications and refusing to let Dr. Brown examine him. He was punished 1 month in segregation, 3 months grade demotion, and 6 months contact visit restriction. (d/e 155-2, p. 2).

"It appears from the medical records that [the plaintiff] was seen by medical personnel for problems mostly unrelated to his GI issues between July 2006 and July 2007." (d/e 142, p. 6, undisputed fact 30). He did, however, file a complaint with the Illinois Department of Professional Responsibility at some point in 2006. (d/e 155-2, p. 12). "The Plaintiff continued to be seen for routine care, including an EKG, labs, optometry visits, and asthma clinic, on a regular basis through February 16, 2007. On that date, the patient was seen and was treated for hemorrhoids." (d/e 142, p. 7, undisputed fact 31).

In March 2007, the plaintiff wrote Dr. Elyea a letter described his debilitating pain, difficulty moving his bowels and difficulty sitting up because of the pain. (d/e 155-2, p. 7). In April 2007, the plaintiff wrote Dr. Brown about his hemorrhoids, which the plaintiff asserted

---

³According to *Dorland's Illustrated Medical Dictionary (29th Ed.)*, an ileus is an "obstruction of the intestines." Adynamic refers to an "ileus resulting from inhibition of bowel motility, which may be produced by numerous causes, most frequently by peritonitis." *Id.*

5

were getting worse, and his difficulty having a bowel movement. (d/e 155-2, p. 11). On July 5, 2007, the plaintiff sent letter to Dr. Brown asking for a renewal of his hemorrhoid medication that had just run out. The plaintiff stated, "you know that the hemorrhoids are the main cause of my bowel blockage, and when they are swollen I can't shit, I can't even pass gas." (d/e 155-2, p. 10).

Dr. Brown saw the plaintiff on July 10, 2007. Dr. Brown prescribed Dulcolax, assessing the plaintiff with "short bowel syn." (d/e 142-2, p. 1). His objective findings were "short bowel, adhesions,[4] constipation, ventral hernia, rectal prolapse. He massages his belly to enhance peristalsis." (d/e 142-1, p. 1). Dr. Brown saw the plaintiff again on August 14, 2007, and prescribed Dulcolax.

On October 3, 2007, Dr. Brown saw the plaintiff again and noted that "[a]dhesions and a ventral hernia are making life miserable. . . " Dr. Brown diagnosed "short, obstructive bowel disease" and wrote "I will discuss." (d/e 155-2, p. 74). He then referred the plaintiff back to Dr. Petty. Dr. Petty saw the plaintiff on October 22, 2007. Dr. Petty's assessment states:

> Chronic abdominal problems, which include pain and bloating. He has had abdominal plain films suggestive of a partially obstructive process. I had previously discussed fixing his hernia laparoscopically, but after discussions with Dr. Brown. We feel that an open exploration to enable us to thoroughly run the entire small bowel and lyse any adhesions would be more appropriate, and repair hernia at the same time. . . .

(d/e 142-2, pp. 7-8). Dr. Petty recommended further diagnostic tests before the surgery, which Dr. Brown approved and which were done, it appears in October and November 2007. (d/e 142, p. 7, ¶ 34; d/e 155, p. 73; d/e 155-2, p. 72).

Dr. Brown referred the plaintiff for the surgery on February 20, 2008. On March 3, 2008, the plaintiff had the surgery, which was successful. Dr. Petty fixed the hernia and also found "[v]ery extensive adhesions requiring a prolonged adhesiolysis, multiple mild transition points, and questionable afferent loop syndrome and therefore, enterenterostomy performed." (d/e 155-3, p. 1). More particularly:

> There were a lot of omental and bowel loop adhesions to the abdominal wall which I carefully freed up with sharp dissection. No eterotomy. I then spent at least an hour and a half doing just adhesiolysis. He had very extensive adhesions throughout all bowel loops; also adhesing bowel into the pelvis. I could not make

---

[4]According to the American Medical Association's *Complete Medical Encyclopedia (copyright 2003, p. 119)*, adhesions are "[b]ands of scar tissue that form between the loops of the intestines or between the intestines and the abdominal wall. . . Adhesions may cause pain in the abdomen when they are pulled or stretched because scar tissue is not elastic."

6

out any of the small bowel anatomy or define his anastomoses until I had freed all
this up and therefore, spent a lot of time doing so . . . .

. . . Transverse colon adhesed up over the stomach and liver and this was a little
difficult as well. It was an anticolic loop. It did appear mildly distended, but it
was a little difficult to tell whether it was having any chronic obstructive
problems. I felt it prudent to go ahead and do an omega loop enteroenterostomy[5]
between the afferent and efferent loops in order to mitigate that possibility.

(d/e 142-2, p. 12). Dr. Petty's surgical notes describe the hernia as "not that large" and fixable without mesh. (d/e 142-2, p. 12).

Since the surgery, the plaintiff no longer suffers from intense cramping and abdominal pain, though he does experience painful "charlie horses" if his intestines get too full and he does not have a daily bowel movement. He avoids this by taking a laxative twice a day. (d/e 160, p. 3).

Defendant Dr. Brown has submitted an expert report from Dr. Robert G. Mosley, M.D., who is board certified in gastroenterology. (d/e 165-1). Dr. Mosley opines that the plaintiff "suffers from a condition that has no cure." (d/e 165-1, ¶ 48). He opines that all of the tests ordered were appropriate and "showed no definitive organic obstruction," and that "[i]t was appropriate for Dr. Brown to refer the patient to the outside physicians and to rely upon their recommendations for treating this patient." (d/e 165-1, ¶ 52). He further opines that "[a]t no time was it specifically clear what the cause of the patient's GI symptoms is or was. Care should be individualized based on an individual's specific complaints. Based upon the records I have reviewed, the diagnostic tests have not led to any specific diagnosis to account for the patient's complaints." (Dr. Mosley Aff. ¶ 50).

**Analysis**

Deliberate indifference to a serious medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). It is clear from the plaintiff's descriptions of his pain and difficulty moving his bowels that he suffered from a serious medical need.

Showing a serious medical need is not enough, though. The plaintiff must also have enough evidence for a juror to find that a defendant was deliberately indifferent to that need. Deliberate indifference is not negligence or even gross negligence. *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *citing Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991);

---

[5]An "enteroenterostomy" is the "establishment of a new communication between two segments of intestine." *Stedman's Medical Dictionary* (28th Ed., copyright 2006).

*Farmer v. Brennan*, 511 U.S. 825, 836 (1994). It is "intentional or reckless" conduct: "Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to the prisoner exists, but the defendant disregards that risk." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Id.* at 441. Deliberate indifference may be also inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances."). However, malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

The plaintiff asserts that Dr. Brown knew that adhesions were the problem because he wrote it in the plaintiff's medical records in July 2007. Yet it seems clear that Dr. Brown had no idea what was causing the plaintiff's pain or how to treat it. Dr. Brown had many ideas as to what might be causing the problem: small bowel syndrome, hemorrhoids, hernia, adhesions, irritable bowel sydrome, obstruction, etc., but he did not know. Not knowing is not deliberate indifference, though. Deliberate indifference would be refusing to refer the plaintiff out to specialists. Here, Dr. Brown referred the plaintiff to a gastrointestinal specialist, a surgeon, and sent him to the emergency room. Multiple diagnostic tests were conducted outside the prison, which revealed no smoking gun. None of the outside doctors were able to definitively diagnose the plaintiff's problems, though all agreed that the hernia was probably not primarily to blame and that surgery was not indicated after the plaintiff's June 2006 trip to the emergency room. Dr. Petty eventually again recommended hernia surgery, but after a conversation with Dr. Brown additional exploratory surgery was included. It was this exploratory surgery, of which Dr. Brown approved, that discovered the extensive adhesions. In sum, it is clear that the plaintiff suffered from prolonged, debilitating pain, but it is also clear that Dr. Brown took that pain seriously, referred the plaintiff to specialists, and followed the specialists' recommendations. The court does not see what more Dr. Brown could have done to help the plaintiff.

The plaintiff assails Dr. Brown's failure to schedule a colonoscopy after the plaintiff returned from his trip to the emergency room in June 2006. There the plaintiff had been diagnosed with a possible partial obstruction. Yet the plaintiff had already had an upper and lower endoscopy, finding no appreciable obstructions. Additionally, no appreciable obstructions were found during the surgery in March 2008. There is just no evidence to conclude that Dr. Brown knowingly or recklessly failed to schedule a colonoscopy, or that doing so would have made any difference.

The plaintiff next asserts that Dr. Brown's advice to use soap as an enema was deliberately indifferent. Dr. Brown admits that he did "advise[] Plaintiff that soap suds could be

8

used as a laxative if needed to deal with his complaints of constipation." (d/e 151, p. 18). A rather strange aside, but in any event the court sees no deliberate indifference from advising the plaintiff to put soap suds in his rectum.

The plaintiff also asserts that his incarceration and pro se status have made it impossible for him to obtain his own expert. This is probably true, but it is immaterial. Even without Dr. Mosley's opinions, it is clear from the medical records themselves that Dr. Brown was not deliberately indifferent to the plaintiff's plight.

Having found no constitutional violation by Dr. Brown, summary judgment must be granted to the other defendants for their alleged failure to intervene.

One more issue deserves mention. The plaintiff challenges his placement in segregation after he returned from the hospital in June, 2006. He asserts that Defendant Fuqua intentionally orchestrated his placement in a hot segregation cell by directing Nurse Moore to write a false disciplinary ticket, because Fuqua was tired of his medical complaints.

If the plaintiff is trying to make out a First Amendment retaliation claim against Fuqua, he has failed to show that Fuqua was motivated by any of the plaintiff's First Amendment activities. Fuqua's motivation on this record was her belief that the plaintiff was malingering, exaggerating his pain, and trying to manipulate the system. The court does not believe that the plaintiff was guilty of these things, and writing the ticket may have been an overreaction, but that is not the point. The point is that Fuqua was not motivated by any First Amendment protected activity. And, even if Fuqua was motivated in part by such retaliation, there was a legitimate reason for punishing the plaintiff. He did misuse prescription medication, which was one of the accusations in the ticket. *See Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996)("[T]he ultimate question is whether events would have transpired differently absent the retaliatory motive . . .").

If the plaintiff is trying to make out an Eighth Amendment claim based on the conditions in the segregation cell, this claim fails as well. His description is too vague and he offers no evidence that Fuqua or any of the other defendants were aware of the alleged conditions. The plaintiff also asserts that Dr. Brown failed to give him medicine when he was in segregation. But Dr. Brown's note states only that no laxatives would be given at this point, which was understandable in light of the plaintiff's misuse of the Dulcolax.

IT IS THEREFORE ORDERED:

1) The defendants' motions for summary judgment are granted (d/e's 142, 144). The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs.

2) If the plaintiff wishes to appeal this judgment, he must file a notice of appeal with

this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Entered this 29th Day of December, 2010.

\s\Harold A. Baker

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE